SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

WELLSHIRE SECURITIES, INC., Ventura Inc., Environmental Landfills, Inc., Robert Edwin Cohen, Carol Catherine Martino, Joseph Jenkins, Jr., Edward David Braverman, Alan Diamond, Paul V. Winters, Jr., Robert Beck, Richard Sands, Defendants.

No. 90 Civ. 1707 (KTD).

United States District Court, S.D. New York.

April 27, 1990.

Lawrence Iason, Regional Administrator, S.E.C. (Edwin H. Nordlinger, Jeffrey Plotkin, Mark S. Mandel, Allen Meyer, Steven M. Cohen, of counsel), New York City, for plaintiff.

Lampert, Lampert & Aretakis (Mitchell Lampert, of counsel), New York City, for defendants Wellshire Securities, Inc., Robert Edwin Cohen and Carol Catherine Martino.

Ross & Hardies (William Pinzler, of counsel), New York City, for defendants Ventura Inc., Robert Beck and Richard Sands.

Berlack, Israels & Liberman (Martin Siegel, of counsel), New York City, for defendant Alan Diamond.

Richard Rubin, for defendant Joseph Jenkins, Jr.

## OPINION

KEVIN THOMAS DUFFY, District Judge:

Plaintiff Securities and Exchange Commission ("SEC") brings, by Order to Show Cause, this motion for a preliminary injunction and temporary restraining order ("TRO") against Defendants Wellshire Securities, Inc. ("Wellshire"), Environmental Landfills, Inc. ("Environmental Landfills"), Ventura, Inc. ("Ventura"), Robert Edwin Cohen, Carol Catherine Martino, Joseph Jenkins, Jr., Edward David Braverman, Alan Diamond, Paul V. Winters, Jr., Robert Beck, and Richard Sands for engaging in transactions, acts, practices, and courses of business which constitute violations of, or aiding and abetting violations of, § 17(a) of the Securities and Exchange Act of 1933 ("1933 Act"), 15 U.S.C. § 77q(a) (1980), § 10(b) of the Securities and Exchange Act of 1934 ("1934 Act"), 15 U.S.C. § 78j(b) (1980), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

This court has jurisdiction over this case because of the alleged federal securities statute and rule violations pursuant to § 22(a) of the 1933 Act and §§ 21 and 27 of the 1934 Act, 15 U.S.C. §§ 77v(a); 78u; 78aa.[1] After granting a TRO against all named and properly served defendants, a hearing in this matter was held on March 23, 26–29, 1990. Wellshire's assets were also frozen pursuant to that TRO. Because the SEC did not timely serve the Order to Show Cause on Braverman, the SEC is not moving for preliminary relief against Braverman. Tr. 5. Environmental Landfills and Winters, its chief executive officer, have consented to permanent injunctive relief. Tr. 4. The following constitutes my findings of fact and conclusions of law.

## FACTS

Wellshire is a Florida corporation with its principal place of business located in Manhattan. Cohen Affid. at 2. Since May 20, 1986, Wellshire has been registered as a broker-dealer and it is a member of the National Association of Securities Dealers ("NASD"). Plaintiff's Trial Exh. 1 at 27.

---

1. The Supreme Court determined that § 21(d) of the 1934 Act authorizes the SEC to seek injunctive relief when it appears that an entity: "is engaged in or is about to engage in acts or practices constituting" a violation of the 1934 Act (e.g., § 10(b)), or regulations promulgated thereto (e.g., Rule 10b–5), and requires a district court "upon a proper showing" to grant injunctive relief.
*Aaron v. SEC*, 446 U.S. 680, 688, 100 S.Ct. 1945, 1951, 64 L.Ed.2d 611 (1980) (interpreting 15 U.S.C. § 78u(d)).

Wellshire is wholly owned by Magna Financial Services Group, Inc. ("Magna Financial"), which, in turn, is wholly owned by Cohen. Plaintiff's Trial Exh. 1 at 17–22; Tr. 322. Cohen is also Wellshire's President and responsible for its overall operations and day-to-day activities. Cohen Affid. at 1.

Martino is Wellshire's Executive Vice President and is responsible for coordinating Wellshire's retail sales and marketing, including recruitment of new representatives, supervision of Wellshire branch offices, and management of Wellshire's sales in New York. Cohen Affid. at 18–26. She has an unexercised option to become an owner of the firm. Plaintiff's Trial Exh. 2 at 9–11, 18. Cohen and Martino consider themselves to be Wellshire's two principals. Employed by Wellshire as the firm's trader, Diamond, and occasionally Martino, acted as the firm's compliance officers.

Diamond's tenure at Wellshire lasted from November 1987 to October 1989. Plaintiff's Trial Exh. at 50, 80. Previously, Diamond was employed in the securities brokerage industry roughly since 1961. Diamond Deposition at 10. Jenkins began working as a Wellshire registered representative in the spring of 1989. Plaintiff's Trial Exh. 3 at 63. Prior to that, Jenkins had worked for various broker-dealers since 1972. Jenkins Deposition at 10–17. Braverman was hired by Wellshire as a recruiter and trainer of new brokers; he subsequently acted as Jenkins' assistant in sales. Plaintiff's Trial Exh. 1 at 90–94. According to the SEC, Braverman's broker's license was suspended by, and he owed a $10,000 fine to, the NASD. The basis for these sanctions were allegations that Braverman engaged in unauthorized trading in customer accounts at another securities firm. *See* Plotkin Affid. in Support of Plaintiff's Order to Show Cause for a TRO and Preliminary Injunction ¶ 7 ("Plotkin Affid."); Tr. 366–70.

The charged violations emanate from a classic penny stock "boiler room" scheme operated by Wellshire. Tr. 5. Often "boiler room" tactics involve an intensive selling campaign, through numerous salesmen by telephone or through direct mail offering, for securities of either a certain type or from a specific issuer.[2] Such sales are usually made without regard to the financial stability or the needs of the customer. Fraudulent schemes, broad unfounded speculation, and stock manipulation is common to such boiler room operations.[3]

In Wellshire's case, inadequately supervised and uninformed "registered representatives" were pressured and given various economic incentives to get on the phones and push the brokerage firm's house stocks to the public.[4] As the full record of the instant proceedings indicates, prospective investors were induced into investing by hard-sell techniques based on unfounded predictions made by a cadre of Wellshire registered representatives over the phone and by Wellshire's misleading market letters sent by it through the mails. Investors who purchased Wellshire's house stocks often experienced frustration at the instability of their investments and inability to get their brokers to timely process sell tickets. As a result, customers often forfeited gains or realized losses upon the eventual stock liquidation. *See* Tr. 135–39; 230–39.

Indeed, Wellshire's headquarters are set up like a typical boiler room operation. A few small cubicles surround one large conference room, which is crammed with telephones used for randomly "cold calling" massive numbers of prospective clients. For new brokers, a client base is developed

---

2. *See United States v. Burke*, 718 F. Supp 1130, 1132 n. 2 (S.D.N.Y.) (citing *United States v. Brien*, 617 F.2d 299, 302 n. 5 (1st Cir.), *cert. denied*, 446 U.S. 919, 100 S.Ct. 1854, 64 L.Ed.2d 273 (1980)).

3. *See* The Penny Stock Scandal, BUSINESS WEEK, Jan. 23, 1989, at 74.

4. House stocks are stocks for which either the issuing or buying brokerage house has developed a great financial interest. Wellshire owned a majority of Environmental Landfills shares and was attempting to purchase all of its float and some of its privately owned blocks. Wellshire was the issuer and underwriter for Ventura stocks in an initial public offering ("IPO") which closed in or about October 1988. Plaintiff's Exh. 20, ¶¶ 83–84; Tr. 103.

either from already existing customer lists, consisting of people whose professions require great amounts of ready cash, or simply from telephone books. One of Wellshire's former brokers, Charles Marino, testified that he was encouraged to call prospective customers whose businesses require liquidity, such as contractors, bartenders who own their own bars, owners of "Mom and Pop" businesses, and carpenters. Tr. at 32–33.[5]

New brokers or representatives were encouraged to sell primarily the house stocks. Wellshire's house stocks include: Environmental Landfills, Ventura, Greenleaf Capital ("Greenleaf"), and Nightwing Group Inc. ("Nightwing"). All of Wellshire's house stocks were comprised of developmental stage start-up companies and/or blind pools.[6] Because these house stocks are highly speculative and listed only in the "pink-sheets," their progress is difficult for investors to keep track of and follow.[7] Wellshire investors, therefore, rely heavily on the assertions, advice, and guidance of Wellshire's brokers, market newsletters, and press releases to assure the soundness and stability of their investment. The SEC's allegations in this case center on Wellshire's and individual defendants' boiler-room tactics in the handling of two house stocks in particular: Environmental Landfills, a start-up company, and Ventura, a blind pool, neither of which had demonstrated operations nor earning capacities.

## DISCUSSION

In order for a preliminary injunction to issue, the SEC must establish: (1) a strong prima facie case of previous securities violations; and (2) a reasonable likelihood that wrongs will be repeated. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 807 (2d Cir.1975); *SEC v. Hansen*, 726 F.Supp. 74, 75 n. 1 (S.D.N.Y.1989). Specifically, the SEC must show a "reasonable and substantial likelihood that defendant, if not enjoined, would violate securities laws in the future." *SEC v. Youmans*, 729 F.2d 413 (6th Cir.), *cert. denied*, 469 U.S. 1034, 105 S.Ct. 507, 83 L.Ed.2d 398 (1984); *accord SEC v. Aqua–Sonic Products Corp.*, 524 F.Supp. 866 (S.D.N.Y.1981), *aff'd*, 687 F.2d 577 (2d Cir.), *cert. denied*, 459 U.S. 1086, 103 S.Ct. 568, 74 L.Ed.2d 931 (1982). In addition, the Supreme Court has held that the SEC is required to show that the defendants acted with knowledge or scienter of their wrongful acts in order to obtain preliminary injunctive relief; a showing of mere negligence is not enough under §§ 17(a)(1) and 10(b). *Aaron v. SEC*, 446 U.S. 680, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). A showing of recklessness may satisfy the scienter requirement. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976). Furthermore, no scienter requirement adheres under §§ 17(a)(2) and (a)(3) which merely make untrue or misleading statements unlawful. *Aaron*, 446 U.S. at 680, 100 S.Ct. at 1947. Thus the SEC need not make any showing of scienter in order to

**5.** Wellshire's cold call script reads as follows:
Hello, this is ——————— from Wellshire Securities, stockbrokers and investment bankers located in New York. Briefly, the reason for my phone call. I'm inviting you to receive our FREE financial market reports which include buy and sell recommendations. There is absolutely no obligation on your part. Mr./Ms. ———————, from time to time, exceptional situations do develop in the market and at that time, we contact our regular trading clients. If we should come across something exceptional down the road, may I give you a call at the same time? Mr. ———————, if the situation looks good, are you in a position to take advantage of it? Great! Mr. ———————, with your permission may I send you a report? Fine, the address we have for you is ——————— (verify ad-

dress). Thank you for your time and I'll be in touch.
Exh. 29 Annexed to Plotkin Affid.

**6.** A blind pool is formed when stocks are offered in a hollow company which company's principals have yet to determine where and in what other concerns they will either invest in or acquire. Investors are induced into buying into a blind pool solely on the strength of the principal's knowledge, investing expertise, and assurances of success.

**7.** A "pinksheet stock" is one which is neither traded on an exchange nor does it appear on the automated quotation system of the National Association of Securities Dealers. Pinksheet stocks are quoted only in the daily listings for the "National Quotations Bureau;" they are not generally listed in daily newspapers.

obtain preliminary relief pursuant to those subsections.

## I. PRIMA FACIE CASE

█ As a threshold matter, Wellshire and its principals, Cohen and Martino, maintain that *Aaron*'s scienter requirement cannot be met as to them, for, at best, they were merely negligent in supervising their brokers. The testimony and evidence adduced at the hearing, however, belie that assertion.

The record is replete with evidence that Wellshire employed misleading and misrepresentative tactics to defraud its investors. Wellshire, together with and through its principals, intended to encourage investments based on misleading information contained in its market letters, telephone scripts, and correspondences. Moreover, Wellshire brokers, under the guidance and training of Cohen and Martino, encouraged investment in certain house stocks based on unfounded price predictions, bogus assurances that the house stocks would be imminently listed on the exchanges, and by actually manipulating stock prices absent market forces. Cohen and Martino affirmatively fostered and induced the continuing misrepresentations made by junior employees. As such, they were not mere innocents who, by their simple negligence, failed to adequately supervise a few shoddy brokers. I therefore find that *Aaron*'s scienter requirement is sufficiently established as to Cohen and Martino, Wellshire's principals. In addition, the evidence adduced at the hearing conclusively links Jenkins to several securities law violations in that he acted on his own behalf and in furtherance of violations committed by Wellshire and its principals. While the actions of Diamond, the firm's trader, may not rise to the level where it can be absolutely determined that he "knowingly" or "recklessly" committed fraud, the SEC establishes a prima facie case for preliminary relief against him under §§ 17(a)(2) and (a)(3) in that these sections do not require

scienter as a predicate for preliminary relief.

As one of several examples, Marino, a former Wellshire broker, testified that to the limited extent due diligence was exercised to ascertain an investor's financial history, it was wholly disregarded in connection with the sale of Wellshire's house stocks. Wellshire's brokers pushed the house stocks regardless of a customer's investment needs and contrary to their demonstrated portfolios. New brokers employed a standard set of rebuttals when customers appeared leery of investing in the house stocks. Tr. 30. Specifically, brokers were encouraged by high commission incentives and sale contests to sell Environmental Landfills and Ventura. Tr. 32–42. In turn, customers were induced to purchase those stocks based upon unfounded and often inflated price predictions, false and misleading information about the issues, high-pressure sales tactics, and in many instances placement of unauthorized trades in accounts. Tr. 22–35.[8]

To show that Wellshire routinely used due diligence in ascertaining customer's financial histories, Wellshire, Cohen, and Martino submitted a questionnaire form. The form requires brokers to solicit certain financial and investment information from prospective customers. *See* Exh. annexed to Wellshire's Proposed Facts and Conclusions of Law. This form was created by Wellshire pursuant to Rule 15c–2 which, according to Wellshire, "requires that broker-dealers obtain [certain] information to determine if the solicited purchase of a designated security is suitable for [the customer] and if [he or she] is capable of evaluating the risks of such transaction." However, the existence of the questionnaire is not probative of whether Wellshire and its principals heeded the financial constraints of its customers once the information elicited was memorialized on a form.

Nor does the submission of such a questionnaire prove that brokers were mindful

---

**8.** Although Wellshire does not deny that unauthorized trades were placed in customer accounts without the customer's prior approval, Wellshire claims that all of these trades were

either later ratified or that nothing could be done after the fact. *See e.g.,* Plaintiff's Exh. 10 at ¶¶ 41, 62–68, 72–76, 80–81, 85–87, 90, 92–94.

of the investors' concerns and financial limitations given the economic incentives that Wellshire provided its salesmen to trade almost exclusively in house stocks. Tr. 27–39, 48. The commission to salesman when Wellshire was acting as a dealer was determined as a proportion of the spread between bid and ask prices of the stock. Because the margin between Ventura and Environmental Landfills bid and ask prices were wider than NASDAQ[9] issues, it was in the broker's best interests to sell Wellshire's house stocks. Tr. 39–48. On big board stocks, commissions may amount only to 1% or 2% of the sale while Wellshire salesmen realized commissions of up to 50% of the spread between bid and ask prices on sales made of Ventura and/or Environmental Landfills. *Id.*

Wellshire's questionnaire, therefore, merely indicates that it exercised a modicum of due diligence in developing the financial histories of its customers. Nonetheless, the evidence is overwhelming that once the information was elicited, brokers were encouraged to promptly disregard it and to use all efforts to keep the prices of house stocks inflated in the absence of market forces. In furtherance of that agenda, Martino, with Cohen's approval, trained new brokers to become well-versed in scripted hard-sell techniques effected through a series of persistent phone contacts with prospective investors.[10] Although none of these techniques are per se illegal, such techniques are unsavory and too often manipulative. It is, however, illegal to mislead the public as to certain information material to investors and upon which they rely when investing.

## A. *Environmental Landfills*

At the hearing, several witnesses, including former registered representatives, testified that Wellshire's house stocks were often sold to the public based on patently false statements. As the prime example, it was revealed that some of Wellshire's market letters contained blatantly false information regarding the status of the Hertel landfill site in Plattekill, New York. Hertel is wholly owned by Environmental Landfills, which in turn is one of Wellshire's house stocks at issue. Plaintiff's Trial Exh. 5 at 1; Plaintiff's Trial Exh. 6 at 10.

Specifically, Wellshire's market letters stated that the Hertel dumping site was "grandfathered" and thus did not have to meet certain environmental standards in order to begin immediate, profitable, and legally sound operation. Tr. 44. While Wellshire's principals might have initially been mislead by Winters, the Chairman and C.E.O. of Environmental Landfills, into believing that the Hertel site was grandfathered, Wellshire, without any further investigation, willingly adopted that language into a market letter that it disseminated to its customers. Tr. 44; 397–99; Plaintiff's Trial Exh. 6 at 46. Both Winters and Wellshire's principals were or should have been aware of the falsehoods before the letter's publication. In fact, the only remotely persuasive argument raised is that the New York State Supreme Court stated, at some point and apparently in another context, that the site was "legal." This is insufficient, however, in light of the

---

9. National Association of Securities Dealers Automated Quotation system.

10. All new trainees employed a series of the following phone solicitation methods, in one week intervals, in order to build a client base. The first call, "the cold call," was intended to initiate conversation with a potential customer in order to determine whether he or she has past invested in the stock market and whether he or she would be presently interested in investing money in the stock market. Sales were neither encouraged nor condoned at this stage. The second call, "the qualifying call," was intended to be purely informational; brokers were encouraged to show interest in the potential buyer's past investment history in order that the broker may find investments compatible with the buyer's needs and consistent with past investment histories. Sales were neither encouraged nor condoned at this stage because Wellshire did not want to intimidate the potential buyer into investing at this stage. The third and final call, "the closing or sale," was intended as a hard sell, often investors were encouraged to purchase the house stocks. New trainees were enlisted by Wellshire primarily in order to sell the house stocks while seasoned brokers with set client bases and favored stocks did not have to sell the house issue.

fact the Hertel site is currently not a legal dumping site and cannot operate legally without massive clean-up efforts and strict measures undertaken for government compliance and approval. Tr. 262–72.

The principals of both Environmental Landfills and Wellshire were or should have been aware that it would be years before Hertel could be operable as a landfill. In fact, Hertel is still years from being operational and it was, in the very least, reckless for Wellshire to have projected otherwise in its market letters. Plaintiff's Exh. 6 at 144–46; Exh. 31 at 2; Tr. 270–72. Moreover, dumping sites are not traditionally "grandfathered" and it was, in itself, at least reckless to allow such a term to be incorporated into Wellshire's market letters. This constituted a clear violation of the anti-fraud provisions of the securities laws.

Indeed, Judith Ferry, a regional attorney overseeing the Hertel site on behalf of the New York State Department of Environmental Conservation ("DEC"), testified that Winters was present during several meetings concerning the Hertel site and knew that the site was not operational. She also testified that the site has to date neither been considered operational nor "grandfathered." Tr. 262–70. Ferry testified specifically that at the time that the statement appeared in the newsletter, it would have been illegal to operate Hertel as a landfill and that she knew that Winters was privy to this information by virtue of his attendance at DEC meetings. Tr. 262–72. Finally, after misleading and untruthful market letters were disseminated to the public, Ferry sent Winters and Environmental Landfills a letter, a copy of which was sent to Wellshire, which stated that "in our [DEC's] opinion, the annexed document [a Wellshire market letter] reflects an inaccurate assessment of the likelihood that this site will some day operate as a legal landfill...." Tr. 270–73. Again, it was adduced at the hearing that by the time Wellshire's principals received the letter, they knew or should have known

that they had published blatant misstatements which were relied upon by investors.

### B. *Ventura*

#### i. Primary Liability

Ventura is a Delaware corporation with its principal place of business in Needham, Massachusetts. Plaintiff's Trial Exh. 7 at 2. In the fall of 1988, Ventura registered 3,000 units of its securities ("a blind pool") with the SEC for sale to the public and the offering closed after all of the 3,000 units were sold. *Id.* at 1. Units consisted of stocks and warrants.[11] Diamond, Wellshire's trader, among others, was implicated in manipulating Ventura's prices. Tr. 115–16, 164–66, 214–15, 359–61. Braverman, whose broker's license was suspended, illegally transacted business in the Ventura stocks on behalf of Wellshire customers with the knowledge and under the supervision of Martino and Jenkins. Plaintiff's Exh. 54. Although Cohen argues that he did not know that Braverman's broker's license was actually suspended and believed that Braverman could not get licensed only because of his inability to pay the outstanding $10,000 fine to the NASD, knew as well that Braverman was not allowed to procure customers or effect sales for Wellshire. Tr. 367–70.

Additionally, the SEC made a prima facie case that Wellshire, through Cohen and Martino, without any valid rationale directed Diamond to arbitrarily raise the price of Ventura stock. Cohen further directed, without proven foundation or necessity, that the Wellshire sales force repurchase Ventura warrants from their customers because Cohen "didn't want them [the warrants] to get outside where someone else could get a big payday." Tr. 115–16. Moreover, Cohen testified that he was apprehensive of selling house issues to other broker-dealers in the open market because he feared that it would be perceived as a "dumping" of bad stock if the issuing brokerage house relinquished control of its shares to "the street," meaning Wall

---

**11.** A warrant is an option to buy a unit of stock at a predetermined price locked in by the terms of the stock sale agreement. Initial public offerings are sometimes offered in units of stocks and warrants. Ventura units consisted of stock, "A warrants," and "B warrants."

Street. Therefore, Cohen encouraged his staff to restrict sales of certain in-house stocks to Wellshire customers so that the price would remain high and investors could be manipulated into believing that their investments were sound. Tr. 48; 395–99.

In addition Cohen and Martino allowed certain unauthorized transactions to take place in customer accounts, without the customer's prior approval, later expecting those customers to ratify the trades.[12] Furthermore, the SEC made a prima facie showing that Cohen, Jenkins, and Braverman disseminated misleading statements that Ventura was to be listed imminently on the NASDAQ, and made unfounded predictions of Ventura's worth and future stock prices when it had neither demonstrated profits nor earning capacities. Tr. 214–16; 230–235; 290–96; 390–96; 474–85.

Finally, the SEC established prima facie that Wellshire's claims, that Ventura would imminently be listed on the NASDAQ and/or Vancouver markets, were completely unfounded and used merely to encourage either purchases or ratification of transactions for Ventura stocks and warrants. See, e.g., Plaintiff's Trial Exh. 54 at 48–64. In several instances, Wellshire principals and employees touted imminent listing of the house stocks on exchanges without ever having applied for such listings. As a specific example, Dr. Enrico Mango, a Wellshire investor, tape recorded several of his communications, one of which revealed that Jenkins and Braverman assured Mango of Ventura's listing "tonight" on the Vancouver exchange. Plaintiff's Trial Exh. 54 at 48–64. This false information was being disseminated under Martino's supervision by Jenkins and his assistant Braverman, who by these conversations illegally held himself out as a registered Wellshire representative after

his license was suspended by the NASD. In addition, Cohen not only accepted responsibility for the illegal actions of his staff, he admitted that he too might have made predictions as to when Ventura could be listed on the NASDAQ which were misunderstood by brokers. Tr. 358–62; 367–99.

All of the above evidence establishes prima facie that Cohen, Martino, Diamond, Jenkins, and Braverman grossly manipulated the market for and disseminated false and misleading information with regard to Ventura stock in violation of the securities laws.

ii. Aider and Abettor Liability

■ Next, I find that Diamond, as the firm's trader, aided and abetted securities violations. Factors which must be shown for aider and abettor liability are the existence of securities law violations by a primary party, knowledge of such violation by the aider and abettor, and substantial assistance by aider and abettor in achievement of the primary violation. *Jubran v. Musikahn Corp.*, 673 F.Supp. 108 (E.D.N.Y.1987); *accord, Moss v. Morgan Stanley Inc.*, 553 F.Supp. 1347 (S.D.N.Y.), *aff'd*, 719 F.2d 5 (2d Cir.1983), *cert. denied*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). As the firm's trader, Diamond fraudulently affected the price of Ventura stock while under Cohen's direction. Diamond knew of the illegality of his actions and testified that he had voiced his concern over arbitrarily increasing Ventura's stock prices. Cohen conceded that, in retrospect, it was neither prudent nor warranted under the circumstances, since market forces did not indicate the need for a price increase. Tr. 164–66, 214–15, 359–61. I find, therefore, that Diamond aided and abetted Cohen's stock price manipulations and that a prima facie case for aiding and abetting Cohen's

---

12. A typical example of Wellshire's manipulation involves Anthony Decesare, a Wellshire investor. He testified that in several instances he was mislead into investing in the high risk pink sheet stocks, including Ventura. Additionally, Decesare attests that, without prior approval, his brokers authorized certain trades on Decesare's behalf forcing him by high pressure sales tactics to later ratify some of these trades.

Because Decesare is fully retired and subsists on a fixed income, he was seeking sound investments and could not afford great losses in risky ventures. Decesare neither authorized nor willingly ratified all such trades involving Ventura stocks and warrants, regardless that such transactions were executed by Braverman and Jenkins in his Wellshire account. Tr. 229–44.

securities' law violations was established against Diamond.

Likewise, the SEC established that Jenkins aided and abetted frauds by allowing Braverman to hold himself out as a registered representative, although his license was suspended, and to transact customer business while under Jenkin's supervision. Plaintiff's Exh. 54.

### C. FELCO

■ The SEC alleges that Ventura, along with its principals Beck and Sands, knowingly mislead the public as to the financial prospects of its subsidiary, First Equipment Leasing Corporation ("FELCO"). Beck has been a trustee and a member of a voting trust which represents a controlling interest in Ventura since Ventura's acquisition of FELCO. Plaintiff's Trial Exh. 7 at 23. Currently, Beck is Chairman of Ventura's Board and a Senior Equity Portfolio Manager of the Putnam Company, a registered investment company. Tr. at 438; Plaintiff's Trial Exh. 8 at 10. Sands has, at all times relevant to this action, been an officer and a member of the Board of Directors of FELCO and/or Ventura. Plaintiff's Trial Exh. 9 at 7, 12–14, 17, 60–62.

In the spring of 1989, Ventura acquired FELCO, a Massachusetts corporation that leased, among other things, exercise equipment. Tr. 440–47. Although FELCO had acquired insurance and entertainment subsidiaries by the time Ventura took over, both concerns were in a development stage with no proven financial histories. Tr. 459–461.

I find that the case established against Beck and Sands for the alleged violations in connection with Ventura's FELCO concerns was insufficient. Both Beck and Sands used due diligence in correcting Wellshire's market letter misstatements and misinterpretations of projected profits with respect to FELCO and its entertainment and reinsurance subsidiaries. Likewise, both Beck and Sands, on the assertions of accountants, believed that although none of Ventura's subsidiaries had demonstrated an earning capacity, both the reinsurance and entertainment concerns had a valid projected earning potentials as going concerns. Tr. 440–50. In addition to demonstrating good faith in their financial reporting, Beck and Sands enlisted the help of an attorney to verify that the information disseminated to Wellshire for its market letter was forthright and truthful.

I find that any nexus between Beck and Sands and securities violations to be too weak to constitute the requisite showing for a prima facie case. Moreover, Wellshire, controlled almost exclusively by Cohen, vested in Cohen control of the supply of Ventura stock that essentially constituted the only market for that stock. Wellshire alone had the means to alert Ventura shareholders of developments. Neither Beck nor Sands profited by their positions in the Ventura stock.

In sum, I find that a prima facie case of securities violations is established as to Wellshire, Cohen, Martino, Diamond, Jenkins, and Ventura. The SEC failed to make a prima facie showing of securities violations as to Beck and Sands with respect to FELCO.

### II. LIKELIHOOD OF REPETITION

■ Evidence that a company is integrally involved in the securities markets weighs heavily in support of a finding that there exists an opportunity and/or a reasonable likelihood for similar additional future violations to occur. *SEC v. Universal Major Industries Corp.,* 546 F.2d 1044, 1048 (2d Cir.1976), *cert. denied,* 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977). Factors relevant to making such a finding include: (1) degree of scienter; (2) sincerity of defendants' assurances against further violations; (3) whether infraction was recurrent; (4) defendants' recognition of the wrongfulness of their conduct; and (5) likelihood that future violations may occur in light of the defendants' occupations and expertise. *See SEC v. Foundation Hai, et al.,* Fed.Sec.L.Rep. (CCH) ¶ 94, 961 (S.D.N.Y.1990) (citing *SEC v. Champion Sports Management,* 599 F.Supp. 527, 534 (S.D.N.Y.1984)); *accord SEC v. Commonwealth*

*Chemical Securities, Inc.,* 574 F.2d 90, 100 (2d Cir.1978).

I find that Wellshire in hand with and through its principals, Cohen and Martino, intended to encourage investments based on misleading information contained in market letters, phone, and mailed correspondences. Furthermore, Jenkins, together with his assistant Braverman, acted in knowing disregard for the securities laws. The SEC further established that Cohen, Martino, Diamond, Jenkins, and Braverman were integral players in bringing about the manipulation effected by Wellshire brokers, and were not merely negligent. Therefore, in light of Cohen's, Martino's, Diamond's, and Jenkins' vast expertise in the securities market, their reckless actions, the recurrent and patterned nature of the infractions, and their awareness of their own wrongdoing, the SEC established a likelihood of repetition. Having found that a likelihood of repetition exists, the SEC established the requisite elements for a preliminary injunction sufficient to enjoin Wellshire, Cohen, Martino, Diamond and Jenkins from further violations of the securities laws.

For the foregoing reasons, Wellshire, Ventura, Cohen, Martino, Diamond, and Jenkins are preliminarily enjoined from engaging in similar transactions, acts, practices and courses of business which, as aforementioned, violated the antifraud provisions of the securities laws. Wellshire assets will remain frozen during the course of this action. Although the complaint survives as against Braverman, no injunction can issue since the order to show cause was untimely served. Winters and Environmental Landfills have stipulated to permanent injunctive relief. This motion for a preliminary injunction is denied as against Beck and Sands, but the complaint survives as to them.

SO ORDERED.