SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

Carol C. MARTINO and CMA Noel, Ltd., et al., Defendants.

Gerard Haryman and Jtm Limited, Relief Defendants.

No. 98 CV 3446(MP).

United States District Court, S.D. New York.

April 2, 2003.

Daniel J. Goldstein, Carmen J. Lawrence, Rebecca A. Buder, Theresa M. Ward, Henry Klehm, III, Securities and Exchange Commission, New York City, for Securities and Exchange Commission, Plaintiff.

Seymour Glazner, Dickstein, Shapiro, Morin & Oshinsky, LLP, Washington, DC, for Paul J. Montle, LS, Capital Corp, Defendants.

Ira Lee Sorkin, Squadron, Ellenoff, Pleasent & Lehrer, Paul A. Batista, New York City, for Carol C. Martino, CMA Noel, Ltd., Defendants.

Paul A. Batista, New York City, for JTM Limited, Gerard Heryman, Defendants.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

POLLACK, Senior District Judge.

Plaintiff Securities and Exchange Commission ("Commission") has moved for summary judgment against defendants Carol Martino ("Martino"), CMA Noel Ltd. ("CMA"), Gerard Haryman ("Haryman"), and JTM Limited ("JTM").[1] Defendant Martino, a former stock broker, is a recidivist securities law violator and convicted felon (for related tax evasion). This civil enforcement action concerns Martino's latest securities law violations. The Commission charges Martino with (1) flagrantly and repeatedly violating a 1992 Commission order barring her from associating with a broker or dealer (the "Bar Order"); (2) acting as an unregistered broker in violation of the federal securities laws; and (3) engaging in a scheme to manipulate the stock price of one of her

---

1. Martino, CMA, Haryman, and JTM are the only defendants remaining in this action. Seven other defendants have settled, and the Commission obtained a trial judgment against defendant Paul Montle. *SEC v. Montle, et al.,* 98 CV 3446 (S.D.N.Y. July 12, 2001), aff'd, 53 Fed.Appx. 144, 2002 WL 31768156 (2d Cir. 2002).

largest brokerage clients, RMS Titanic, Inc. Defendant CMA was Martino's closely-held brokerage firm, through which she violated the Bar Order. The Commission seeks against Martino and CMA disgorgement of their illegal brokerage commissions, an injunction against future securities law violations, and other relief.

Defendants Haryman (Martino's husband) and JTM, sued herein as "Relief Defendants," assisted Martino in the purchase of a luxury yacht called "Je T'aime" (the "Yacht") held in the name of defendant JTM, an offshore company wholly-owned and controlled by Haryman. In May 2002, the Commission obtained a preliminary injunction against Martino, CMA, Haryman, and JTM (the "Yacht defendants"), freezing the Yacht and ordering the Yacht defendants to preserve it for payment of any monetary judgment against Martino and/or CMA. The Commission seeks an Order requiring the Yacht defendants to turn over the Yacht to a Court-appointed Receiver to satisfy in part the Commission's monetary judgment against Martino and CMA.

The Commission is entitled to summary judgment on all of its claims against Martino, CMA, Haryman, and JTM because no material dispute of controlling fact exists regarding these claims, and Martino and CMA plainly violated the securities law provisions (and the Bar Order) at issue. Martino's defense has been "advice of counsel," which, as explained below, is without merit. The Commission previously moved the Court for an Order precluding Martino from testifying at trial or on summary judgment, based upon her refusal to testify at her deposition in this case (she asserted her Fifth Amendment privilege). Martino has submitted her affidavit of opposition hereon. That presents no controlling opposition to summary judgment even if credited as her testimony in opposition.

The following sections summarize (1) Martino's previous securities violations culminating in the Bar Order; (2) Martino's subsequent brokerage activities in violation of the Bar Order and the federal securities laws; (3) Martino's participation in the manipulation of Titanic stock; and (4) Martino's attempt to hide her gains through her purchase of the Yacht.

## I. *Prior Commission Proceedings Against Martino*

Prior to this action, the Commission filed a civil enforcement action against Martino and others for securities fraud concerning their activities at Wellshire Securities, Inc. ("Wellshire"), then a registered broker-dealer. In 1990, Judge Duffy in that action issued a preliminary injunction against Martino for orchestrating a boiler room operation at Wellshire. *SEC v. Wellshire Securities, Inc.*, 737 F.Supp. 251, 253–54 (S.D.N.Y.1990). The *Wellshire* Court found that "Martino is Wellshire's Executive Vice President and is responsible for coordinating Wellshire's retail sales and marketing, including recruitment of new representatives, supervision of Wellshire branch offices, and management of Wellshire's sales in New York," and that Martino "occasionally ... acted as [one of] the firm's compliance officers." *Id.* at 254, 261. In holding that Martino possessed the requisite scienter for a preliminary injunction against her, the Court found:

> The record is replete with evidence that Wellshire employed misleading and misrepresentative tactics to defraud its investors. Wellshire, together with and through its principals, intended to encourage investments based on misleading information contained in its market letters, telephone scripts, and correspondences. Moreover, Wellshire brokers, under the guidance and training of [Wellshire President] Cohen and Marti-

no, encouraged investment in certain house stocks based on unfounded price predictions, bogus assurances that the house stocks would be imminently listed on exchanges, and *by actually manipulating stock prices absent market forces.* Cohen and Martino affirmatively fostered and induced the continuing misrepresentations made by junior employees.

*Id.* at 256 (emphasis supplied).

On August 14, 1991, by consent judgment, Judge Ward in *Wellshire* permanently enjoined Martino from further violations of Section 17(a) of the Securities Act of 1933 (the "Securities Act"), Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 thereunder. Ex. 1.[2]

On April 1, 1992, by consent order, and also due to Martino's Wellshire activities, the Commission issued the Bar Order, which barred Martino from associating with any broker, dealer, investment adviser, investment company or municipal securities dealer. *In the Matter of Carol Catherine Martino,* Exchange Act Release No. 30545 (Apr. 1, 1992) (hereinafter, the "Bar Order"). Ex. 2.

## II. *Martino and CMA's Post–Bar Order Brokerage Activities*

Notwithstanding the Martino Bar Order, and from April 1992 through at least 1995,

Martino, through CMA, brokered more than $20 million in sales of stock by several United States companies to overseas investors, purportedly pursuant to Regulation S of the Securities Act.[3] CMA was a "Subchapter S corporation" of which Martino was "President and sole owner." Ex. 3.[4] Martino conducted these transactions using the means of interstate commerce from offices located in New York and Florida (and other United States locations). She earned millions of dollars in brokerage "commissions" from sales of Regulation S stock of at least five companies: Viral Testing Systems Corporation ("VTS"), Chippewa Resources, Inc. ("Chippewa"), Computer Concepts Corporation ("Computer Concepts"), Lone Star Casino Corporation ("Lone Star"), and RMS Titanic, Inc. ("Titanic"). During the time period at issue, Martino and CMA were not registered with the Commission as brokers or dealers. Ex. 4. The brokerage services that Martino provided between each of the U.S. companies listed above and their foreign customers who purchased Regulation S stock from them are mentioned below.

### A. *VTS*

On April 1, 1992 (the same date that the Commission issued Martino's Bar Order), Martino executed an agreement with Teleconcepts Corporation (later known as "Viral Testing Systems Corporation") (collec-

2. "Ex." refers to the Commission's concurrently-filed Appendix of Exhibits in support of its motion.

3. "Regulation S" permits United States issuers to offer and sell securities if *conducted totally outside* the United States while exempting such sales (*i.e.,* sales that comply with Regulation S's conditions) from the Securities Act's Section 5 prohibitions against the sale of unregistered securities conducted in any part in the United States. 17 C.F.R. §§ 230.901–230.905. Martino specialized in brokering sales conducted in part in the United States of deeply-discounted stock of United

States companies to foreign investors pursuant to Regulation S. During the time period at issue, resale of Regulation S stock was prohibited for only forty days, after which the foreign purchasers could sell the stock at U.S. market prices for a significant profit. 17 C.F.R. §§ 230.901–230.904 (1990); *see also* SEC Release No. 33–7505; 34–39668 (Feb. 17, 1998).

4. Because CMA essentially was Martino's alter ego, reference to them hereinafter is both synonymously as "Martino," unless otherwise indicated.

tively "VTS") to broker sales of VTS stock to foreign purchasers. Ex. 5. Under the agreement, Martino was to act as "liaison between buyer and seller" and receive "10% of the gross proceeds" of the stock sales. Ex. 5; Ex. 6 (pp. 245–50). According to VTS chief executive officer Paul Montle ("Montle"), VTS "retained Carol Martino to arrange placements of stock with her clients in Europe" for the purpose of raising capital for VTS. Ex. 6 (p. 245).[5]

According to Montle, Martino brokered at least $10 million in VTS stock sales during the period 1992 through 1993, and she proved to be "instrumental" in the "placement" of VTS shares. Ex. 6 (pp. 245–47); Ex. 7 (pp. 207–23, 225–28, 230–39, 294–95); Ex. 8; Ex. 9. For her services, Martino received at least $1 million in cash commissions (*i.e.*, 10% of the $10 million in VTS stock sales), plus at least 82,500 VTS stock shares. Ex. 6 (pp. 249–50); Ex. 8; Ex. 9; Ex. 10. In an affidavit, Martino refers to her receipt of VTS stock as "commissions due ... in connection with the placement" of VTS shares. Ex. 10.

Martino provided complete brokerage services regarding VTS stock sales, from soliciting potential purchasers, through completing the sales transactions. According to Ilan Arbel ("Arbel"), one of Martino's largest Regulation S stock purchasers,[6] Martino was intimately involved in each stock transaction, and Martino

"was all the time aware of the transactions," from beginning to end. Ex. 7 (p. 215).[7] Not only did Martino encourage Arbel to purchase Regulation S stock, but she also frequently contacted Arbel to ensure the timely and proper completion of the transactions. Ex. 7 (pp. 203–10, 214–17).[8] In general, Martino acted as the "middle person" between Arbel and the U.S. companies issuing Regulation S stock; she "tried to put together both sides" of the stock transactions. Ex. 7 (pp. 217–18).

### B. *Chippewa Resources, Inc.*

On April 20, 1992 (three weeks after the Commission issued Martino's Bar Order), Martino executed an agreement with Chippewa Resources, Inc. ("Chippewa") to broker sales of its Regulation S stock made for overseas investors. Ex. 12; Ex. 13 (pp. 17–22).[9] Martino again was to act as "liaison between buyer and seller" of Chippewa stock.[10] Ex. 12; Ex. 13 (pp. 17–20).

Martino likewise provided complete brokerage services for Chippewa stock sales. She furnished potential purchasers with company information, including Chippewa Commission filings and press releases, and she maintained constant contact with her investors. Ex. 7 (pp. 278–86); Ex. 14; Ex. 15; Ex. 16. Martino also advised Chippewa investors regarding the sale terms that Chippewa favored, Ex. 13 (pp. 38–40), and even attempted to "pre-sell" Chippewa

---

5. In addition, Montle believed that Martino also had "access to a number of other attractive share offerings." Ex. 9.

6. Arbel purchased millions of dollars' worth of Regulation S stock through Martino from Teleconcepts, Lone Star, Titanic, and Computer Concepts. Ex. 7 (pp. 233–42, 248–59, 261–65).

7. Arbel testified that he first learned of VTS during a telephone conversation with Martino. Ex. 7 (pp. 203–207). During that conversation, Martino recommended VTS and

"explained" to Arbel how Regulation S "worked." *Id.*

8. On at least two occasions, Arbel even sent payments for VTS stock (totaling $215,000) directly to Martino. Ex. 7 (pp. 227, 232); Ex. 11.

9. Chippewa subsequently changed its name to Underwriter's Financial Group, Inc. Ex. 13 (pp. 8–10).

10. Martino informed Larson that "she could generate some interest" with investors she knew in Europe. Ex. 13 (pp. 11–12).

stock to investors. Ex. 17. In substance, Martino performed all functions called for under her brokerage agreement with Chippewa. Ex. 13 (pp.17–20). According to former Chippewa CEO Aleron Larson ("Larson"), Martino's role "seemed to be the same role as brokers play here in the United States." Ex. 13 (pp. 32–33). Martino routinely communicated by the telephone and written correspondence with Larson (from her offices in Florida and New York). *Id.* (pp. 40–41); Ex. 18; *see also* Ex. 7 (pp. 278–80). On one occasion, Martino instructed Larson to "send [her] a letter, overnight mail for your transfer agent" to transfer certain certificates for the issuance of 325,000 Regulation S shares. Ex. 19.

In return for her services, Martino received "a percentage of the price at which the stock was sold." Ex. 12; Ex. 13 (pp. 20–22). Martino brokered at least $3 million in Chippewa stock sales and earned at least $398,000 in commissions. Ex. 7 (pp. 207–23, 278–88, 294–95); Ex. 13 (pp. 32–33, 38–44, 105–12, 164–66, 169); Ex. 20; Ex. 21; Ex. 22; Ex. 23; Ex. 24; Ex. 25. Martino and Larson routinely corresponded with each other concerning Martino's "commissions." Ex. 20; Ex. 22; Ex. 23; Ex. 26. Larson, on occasion, instructed the escrow agent that received the proceeds of the Regulation S sales to distribute the commission payments directly to Martino. Ex. 21; Ex. 27.[11]

### C. *Computer Concepts*

On April 24, 1993, Martino executed an agreement with ETR & Associates Incorporated ("ETR") to broker sales of Computer Concepts stock to overseas investors. Ex. 29. Pursuant to that agreement, on May 1, 1993, Martino executed an agreement with Computer Concepts and ETR to act as "liaison between buyer and seller" and to:

(a) Provide Financial information of [Computer Concepts] to brokers and dealers to identify prospective purchasers of securities located outside the United States, (b) interview[ ] and recommend[ ] appropriate broker dealers, selling groups and individuals, (c) advise[ ] and assist[ ] [Computer Concepts] in negotiations with the prospective buyers as to the terms and conditions of the sale of [the stock].

Ex. 30. Under the agreement, Computer Concepts agreed to furnish Martino 1 million shares of Computer Concepts stock to "offer for sale to purchasers." *Id.* Martino agreed to receive 20.5% of the proceeds of each sale. *Id.* Throughout 1993 and 1994, Martino and Hallmark Trading Co. (another Martino-controlled entity),[12] received "commission" payments for these services from Computer Concepts totaling more than $1.2 million. Ex. 31; Ex. 32.

### D. *Lone Star*

In 1993, Martino executed a similar brokerage agreement with Lone Star. Ex. 35; Ex. 7 (pp. 207–23, 240–48, 250–253, 294–95). The agreement allowed Martino to "sell [Lone Star] shares on behalf of the company." Ex. 36. Martino subsequently brokered at least $4.1 million in Lone Star stock sales and earned over $393,000 in cash commissions, plus 65,000 shares of Lone Star stock as a "5% commission." Ex. 7 (pp. 207–23, 240–48, 250–253, 294–

---

11. In a May 13, 1992 correspondence to Larson, Martino instructed Larson not to "disclose our commission" or "mention my name" when speaking with the "chairman/owner of Wellshire Securities, Deutschland GMBH—the brokerage firm buying [Chippewa] stock." Ex. 28.

12. In correspondence, Martino referred to "My Hallmark Trading Co., escrow account at Carlton Fields." Ex. 33; Ex. 34. Aleron Larson testified that Hallmark was a Martino company. Ex. 13 (pp.101–02).

95); Ex. 8; Ex. 37 (pp. 540–41); Ex. 38; Ex. 39.

Martino provided the same complete brokerage services for the Lone Star transactions as she had regarding the VTS (and other) transactions. Ex. 7 (pp.215–18, 227, 232); *see also* Ex. 40 (Martino correspondence to Lone Star's transfer agent providing "official notification" for the issuance of Lone Star stock in connection with a Regulation S transaction). Lone Star correspondence refers to Martino as "the broker on this transaction" (and Martino herself pre-approved that correspondence). Ex. 41; Ex. 39. Another major Lone Star stock purchaser signed an affidavit stating that he relied upon Martino as his "broker and advisor." Ex. 42.

### E. *Titanic*

In May 1993, Martino executed an agreement with RMS Titanic Corp. ("Titanic") to broker sales of its stock to overseas investors. Ex. 43; Ex. 7 (pp. 207–23, 253–59, 294–95). Under that agreement, Martino was to perform all duties normally associated with "the sale of securities," including "serving as a liaison between buyer and seller." Ex. 43. Martino's Titanic Regulation S stock sales services further included:

(a) Provision of financial information of [Titanic] to brokers and dealers to identify prospective purchasers of securities located outside the United States; (b) interviewing and recommending appropriate broker dealers, selling groups and individuals; (c) advising and assisting [Titanic] in negotiations with the prospective buyers as to the terms and conditions of the sale of [ ] securities.

Ex. 43. Martino also represented that she would "offer to sell or solicit orders to purchase securities of [Titanic]" in compliance with Regulation S. *Id.* Under the Titanic agreement, Titanic was to make available to Martino 2,500,000 shares of Titanic stock for placement overseas. *Id.* Martino was to sell the stock at a minimum price of $3.20 per share and to receive a "fee" of 10% of all sales, plus any excess revenue that Titanic received above ·$2.88 per share. *Id.*

Martino subsequently sought Titanic investors. In June 1993, Martino informed Titanic of certain Regulation S stock sales "to date," which she had brokered, and stated, "My selling efforts will be continuous." Ex. 44; Ex. 45. Martino subsequently brokered over $3.6 million in Titanic stock sales and earned cash commissions in excess of $780,000, plus 45,000 shares of Titanic stock. Ex. 46 (pp. F–11, F–12); Ex. 47 (pp. 16, F13–F16); Ex. 48; Ex. 49. Martino likewise provided complete brokerage services regarding those Titanic stock transactions. Ex. 7 (pp. 215–18, 227, 232).

### III. *Martino's Participation in the Titanic Stock Manipulation Scheme*

Martino participated in a scheme, along with co-defendant Paul Montle and William Lowe, to manipulate the price of Titanic stock. Pursuant to this scheme, Titanic's stock price · opened at $5 in May 1993, rose artificially to over $11.50 by July 1993, and fell to $6.50 by July 20, 1993, and to $2.75 by October 22, 1993. Ex. 50; Ex. 51. This Court previously held Montle liable for this manipulation scheme, and the Second Circuit recently affirmed.[13] William Lowe ("Lowe"), a for-

---

**13.** In May 2001, the Court held a bench trial solely regarding the Commission's claims against Montle. On July 12, 2001, the Court issued a judgment against Montle, holding him liable on several counts, including manipulation of Titanic stock (in conjunction with Martino). The Court found that "Martino participated" in the "scheme to manipulate the price of Titanic stock." *SEC v. Montle, et al.*, 98 CV 3446 (S.D.N.Y. July 12, 2001); *aff'd*, 53 Fed.Appx. 144, 2002 WL 31768156 (2d Cir.2002).

mer trader with Grady and Hatch, previously settled an administrative claim with the Commission arising from the Titanic manipulation scheme. Ex. 95.

Montle was instrumental in creating Titanic as a public company and orchestrating the manipulation scheme. Prior to May 1993, Montle acquired a controlling block of stock in First Response Medical, Inc., a public "shell" company. Ex. 52; Ex. 53 (pp. 27–29). Montle acquired First Response to take advantage of potential opportunities to purchase other companies, take them public, and reap the benefit of the enhanced share price. Ex. 53 (pp. 27–29). He eventually found such an opportunity in "Titanic Ventures," a partnership that purportedly owned the rights to salvage artifacts from the submerged Titanic ocean liner. *Id.* In the beginning of May 1993, First Response Medical changed its name to "RMS Titanic, Inc." (Titanic) and purchased Titanic Ventures. *Id.*

Titanic entrusted to Martino and Montle the task of raising Titanic capital through Regulation S Titanic stock sales. *Id.* As noted above, in May 1993, Titanic entered into an agreement with Martino to allow her to broker the sale of 2.5 million Titanic Regulation S shares to overseas investors. The agreement was intended to raise $8 million that Titanic needed to fund its operations. *Id.* Montle and Martino also entered into their own separate agreement to work together on the Titanic Regulation S placements and to allocate between themselves the commissions for these placements. *Id. Securities Exchange Act of 1934.* The Titanic merger agreement further provides that, if by August 3, 1993, Titanic did not receive at least $1 million from the Regulation S sales, Montle was obligated to sell all of his Titanic shares to Titanic for $.01 per share ($5,000). *Id.*

Immediately after the merger, through agreements with Titanic and certain of its shareholders, Montle personally gained effective control over the market supply of Titanic stock. In addition to his own substantial Titanic shares, Montle obtained sale control over the Titanic shares of Elizabeth Culotta [14] and one, Michael Herman (a Montle business associate), in exchange for half the proceeds of any sales of their Titanic stock. As a result of Montle's various agreements, at the start of Titanic stock trading in May 1993, Montle controlled at least 670,000 of the 986,511 potentially tradeable Titanic shares. *Id.*

Titanic also entrusted to Montle the task of finding a broker-dealer to act as a market maker for Titanic's stock in the United States. *Id.*[15] Montle enlisted Lowe of Grady & Hatch to act as the initial market maker for Titanic stock. *Id.* Titanic stock began trading on May 5, 1993, and Lowe was the exclusive market maker for Titanic stock for at least its first thirty days of trading. *Id.* Working with Lowe, Montle set an opening Titanic stock price of $5.[16] That price per share gave Titanic a market capitalization of over $50 million, despite the fact that, as of May 31, 1993, Titanic's

---

**14.** Elizabeth Culotta is the wife of Paul Culotta, Titanic's chief financial officer of Titanic in early 1993. Paul Culotta worked with Montle to organize Titanic's business structure. Ex. 61 (pp. 21–48, 61–71).

**15.** The Exchange Act defines "market maker" as "any specialist permitted to act as a dealer, any dealer acting in the capacity of block positioner, and any dealer who with respect to a security, holds himself out ... as being willing to buy and sell such security for his own account on a regular or continuous basis." 15 U.S.C. § 3(a)(38); *see also Sullivan & Long, Inc. v. Scattered Corp.,* 47 F.3d 857, 859 (7th Cir.1995).

**16.** Lowe offered this price purely on Montle's suggestion, and despite having little or no knowledge of Titanic's actual finances. Ex. 54 (pp. 21–23, 27–32, 85–87, 99–100).

reported total assets of only $4,490,733. Ex. 37 (pp. 572–74); Ex. 55 (p. 4).

Titanic stock began trading May 5, 1993. During the first few days of Titanic trading, the only purchasers were Lowe himself and persons employed in Lowe's trading office. Ex. 54 (pp. 85, 90–92); Ex. 50. Lowe subsequently sought approval from the National Association of Securities Dealers ("NASD") to post a a $7 1/8 bid quotation and a $7 5/8 ask quotation for Titanic stock.[17] Lowe based his proposed price quotations solely upon Titanic trading activity "in the first few days of trading" and the forces of "supply and demand." Ex. 56. Lowe subsequently testified, however, that Titanic trading during those first few days did not constitute actual "demand" for Titanic stock. Ex. 54 (pp. 90–92). Furthermore, NASD representative Claire Catan testified that, had Lowe at that time disclosed to the NASD the extent of Montle's control over Titanic's stock supply, and the fact that Titanic's purported trading "demand" consisted solely of purchases by Lowe himself and his colleagues, the NASD would have requested additional information before approving Lowe's proposed Titanic price quotations. Ex. 56; Ex. 57 (pp. 32–40).

In subsequent Titanic stock trading, Martino, in conjunction with Montle and Paul Culotta, actively sought to control the supply of Titanic stock entering the marketplace. On June 8, 1993, Martino herself purchased 10,000 Titanic shares. Ex. 50. In a June 10 memorandum to Paul Culotta, Montle refers to the trading of Titanic stock as a "very delicate" situation, and the fact that it is "everyone's" expectation that Montle "orchestrate trades." Ex. 58. On or about June 16, 1993, after some disagreement among Montle, Paul Culotta, and Martino concerning their Titanic trading,[18] the three arranged a more formal trading agreement, to avoid driving down the stock price. Ex. 6 (pp. 589–92); Ex. 54 (pp. 36–51); Ex. 60; Ex. 61 (pp. 89–149). The agreement is memorialized in a memorandum to Martino dated June 16, in which Montle "confirms" his "understanding" with Martino regarding "open market sales of [Titanic] during the time period that [Martino's] Reg S placement for the company is ongoing" and sets forth self-imposed sale restrictions for the stock that he and Martino controlled and sold through Lowe:

1. No relative, friend or affiliate of the undersigned will sell [Titanic] shares into the market without [Martino's] prior approval, and subject to the schedule in 2 below.

2. To the extent that Bill Lowe needs to purchase shares to maintain an orderly market [Martino] and [Montle and Paul Culotta] will supply shares as follows:

---

17. The NASD is the organization responsible for overseeing the public trading of such stocks. Upon the authorization of the NASD, the first market maker in a particular security may issue price "quotations"; *i.e.,* the prices at which the market maker stands ready, and is obligated, to buy and sell a minimum number of shares of the security. A "bid" quotation is the price at which a market maker is willing to purchase a particular security; an "ask" quotation is the price at which a market maker is wiling to sell a particular security. Ex. 57 (pp. 9–15).

18. On June 9, allegedly unbeknownst to Martino, Montle sold 30,000 of Elizabeth Culotta's Titanic shares (for $8.50 to $9.25 per share). *Id.;* Ex. 50. In a June 10 memo to Paul Culotta, Montle notes that, consequently, when Martino purchased 10,000 shares on June 8, she "effectively ... bought" the Elizabeth Culotta stock that Montle sold. Ex. 58. On June 15, Montle repurchased 20,000 shares (at $10.375). Ex. 50. When Martino learned of Montle's 30,000 share sale, she accused Paul Culotta of jeopardizing her "ability to fund this deal, as well as [risking] my own hard earned money." Ex. 59.

1st [Martino's] 10,000 shares bought at [8.5 on June 9]

2nd [Elizabeth] Culotta's 20,000 shares bot [sic] at [10.5 on June 15]

3rd [Montle's father-in-law's] 3,750 shares

4th more of [Elizabeth] Culotta's shares

3. [Montle and Culotta] will obtain [*Martino's*] *prior approval* before allowing Bill [Lowe] to purchase any of "our" shares pursuant to this "order of battle."

Ex. 60 (emphasis in original). From May 5, 1993 through July 1993, through their various Titanic stock control agreements, Montle, Martino, and Paul Culotta effectively did control a substantial percentage of the supply of freely tradable Titanic stock. Ex. 53 (p. 28); Ex. 37 (pp. 574–75, 589–92); Ex. 61 (pp. 89–149); Ex. 54 (pp. 36–51); Ex. 58; Ex. 59; Ex. 60.

Martino insured Titanic market maker (Lowe) against loss in his Titanic stock trading. Martino told Lowe that she would supply Lowe with purchasers (*e.g.*, Martino's Regulation S Titanic stock clients) when necessary for Lowe to sell Titanic stock. Ex. 54 (pp. 36–42, 49–51). As noted above, Martino and Montle also purchased stock themselves from Lowe. Ex. 50; Ex. 54 (pp. 24–26, 31–51); Ex. 58; Ex. 61 (pp. 99–104); Ex. 62 (pp. 119–33); Ex. 63 (pp. 7–8); Ex. 64. Martino's guarantee is further evidenced by Lowe's trading activity. From June 8 through July 14, 1993, although other sellers of Titanic stock by then existed, Martino purchased from Lowe 52,500 shares of Titanic (at a total cost of $504,375). Ex. 50. From June 16 through July 20, Martino's foreign Regulation S clients purchased from Lowe an additional 71,610 shares and 16,350 shares from Martino (at a total cost in excess of $878,000), despite the fact that those same clients were purchasing through Martino heavily-discounted Regulation S shares of Titanic stock. Ex. 37 (pp. 581–88); Ex. 64; Ex. 65; Ex. 66; Ex. 67. In a July 21 memorandum to Titanic director Geller, Montle states that Titanic stock sales to one of Martino's foreign clients ("Signature Equities") were "executed in the open market to avoid a total collapse of the share price." Ex. 66. Martino herself also disclosed, in a letter to Titanic General Counsel Alan Carlin, that her foreign client "Josef [Hettrich] bought 20,000 in the market from Grady & Hatch." Ex. 67; *see also* Ex. 59 (Martino informed Culotta that she has a "broker that purchased 20,000 [Titanic] shares to 'help out'"). A Martino letter to Paul Culotta likewise refers to Martino's guarantee agreement with Lowe: "in the event [Titanic stock] isn't bought—Bill [Lowe] is only long 8,000 & we're in trouble! (we'll owe $47,000)." Ex. 68. In reliance on Martino's assurances, Lowe subsequently took far larger positions in Titanic stock than his firm normally permitted him to take.[19]

Montle and Martino's efforts to protect Lowe from trading losses allowed him to raise the price of Titanic stock at least 12 times between May 5 and June 4 (when Lowe was the sole market maker), and to be the high bidder (or one of the high bidders) on thirty-one of the thirty-two trading days between June 4 and July 20

---

19. Grady & Hatch initially prohibited Lowe from holding in excess of $100,000 worth of stock in a single company at the end of a trading day (although apparently they eventually gave him somewhat greater leeway). Ex. 54 (pp. 43–51). According to Lowe himself, some of Lowe's Titanic stock positions during the period at issue were "way out of line."

*Id.* For example, by June 15, 1993, Lowe held Titanic stock with a market value of $286,216 (26,938 shares at $10.625 per share). *Id.*; Ex. 69. He testified that, in such cases, he needed to know that somebody was going to take it off his hands, and that, in the case of Titanic, that person was Martino. Ex. 54 (pp. 24, 36–42, 49–51).

(Lowe was the sole high bidder on 13 of those days). Ex. 50; Ex. 64.

Titanic trading records for the period May through July 1993 further evince the agreements between Martino, Montle, Culotta, and Lowe to control the supply and demand of Titanic stock. During the first thirty days of Titanic stock trading (May 5, 1993 through June 4, 1993), Lowe's purchases and sales of Titanic stock on behalf of Grady and Hatch accounted for 98% of the total Titanic trading volume during that time period. During that same time period, Lowe purchased from Michael Herman (whose stock Montle controlled) 89% of the Titanic Stock that he purchased on behalf of Grady and Hatch. During the period May 5 through July 20, 1993, Grady and Hatch's purchases and sales of Titanic stock accounted for 64% of the total Titanic trading volume. During that same time period, Lowe purchased (either for himself or Grady and Hatch) 33% of the total volume of Titanic stock purchased. The total combined purchases of Titanic stock during that period from Grady & Hatch by Martino, Elizabeth Culotta, Michael Herman, Martino's German customers, and Lowe himself (for his personal account) constituted 51% of the total volume of Grady & Hatch's Titanic stock sales. Furthermore, on at least one occasion, Martino bought 10,000 shares of Titanic stock from Montle. Ex. 64.

In addition, Martino paid certain stockbrokers to purchase Titanic stock for their clients. For example, on June 22, Andrew Zimmer brokered 10,000 shares of Titanic stock at $10.50 for one of his clients. Ex. 59; Ex. 68; Ex. 50. By checks dated June 17 and 29, Martino paid Zimmer $9,250 and $25,000, respectively. Ex. 70; Ex. 71. In a memorandum to Paul Culotta, Martino indicated that the $25,000 payment to Zimmer was for the purchase of 10,000 shares of Titanic stock at $10.50. Ex. 59. Furthermore, from June 22 to June 28,

1993, Mario Iacoviello brokered transactions involving a total of 8,600 Titanic shares. Ex. 50. By check dated June 29, Martino paid Iacoviello $13,125, Ex. 72, and by letter dated June 23, Martino ordered an additional $17,200 wire-transferred to Iacoviello from the "Hallmark, C Martino account." Ex. 73 Martino's memorandum to Culotta also references payments to Iacoviello for brokering Titanic stock. Ex. 59. Furthermore, in a letter to Titanic general counsel Alan Carlin, Martino states, "Please send to CMA Noel Ltd—total $477,900. To date—I'm out of pocket $409,307 (Josef purchased 20,000 in the open market from Grady & Hatch—lost comm. due him $112,000.00 plus—$165,000 from the prior 30,000 shares. Plus $60,000 [has been] paid to U.S. Brokers . . . .") Ex. 67. Finally, in the memo to Culotta, Martino suggests that she, Montle, and Paul Culotta slightly alter their agreed selling order to give selling priority to a "broker that purchased 20,000 [Titanic] shares 'to help out.'" Ex. 59.

## IV. *Martino's Yacht Purchase*

As described above in Section II, Martino reaped millions of dollars in brokerage commissions between April 1992 and 1995. In November 1997, seemingly unbeknownst to the Commission, (and while Income Tax evasion charges were pending against her), Martino used at least $1.28 million of her own funds to purchase a $2 million luxury yacht (the Yacht). The Yacht was placed in the name of an offshore company (defendant JTM), which is wholly-owned and controlled by her husband, defendant Haryman. Martino's purpose was to place the Yacht away from her creditors, according to defendant Haryman.

On March 13, 1997, prior to the filing of this lawsuit, as part of the Commission's administrative investigation of this case,

the Commission took Martino's sworn testimony. Ex. 74. Martino asserted her Fifth Amendment privilege in response to all substantive questions. On or about May 21, 1997, Martino opened a bank account at Banque Paribas Luxembourg, located in Luxembourg (the "Luxembourg Martino account"). Ex. 75. As a favor from Haryman, Martino opened this offshore account to protect her assets against pending lawsuits. Ex. 83 p. 32. Haryman knew the bank and had been dealing with it for several years. On September 26, 1997, the Commission staff sent Martino's counsel a "Wells" letter, which notified Martino that the staff intended to recommend that the Commission file this action against her. Ex. 76. On November 18, 1997, Martino caused Bank Paribas to transfer $1.1 million from the Luxembourg Martino account to the New York bank account of an Argentinian yacht manufacturer named "Astilleros Tarrab, S.A." Ex. 77; Ex. 78.

Martino's $1.1 million payment was partial payment toward purchase of the $2 million Yacht. In November 1997, Martino and Haryman both signed the Yacht purchase agreement as "buyer." [20] Ex. 79. Pursuant to that agreement, over the following fourteen-month period, Martino and/or Haryman wire-transferred the balance of their Yacht purchase payments to the Yacht seller's bank account at Republic National Bank located in New York, N.Y. Through those payments, Martino personally paid at least an additional $180,000 of the final Yacht purchase price. Ex. 81; Ex. 82. In December 1997, Martino and Haryman had the Yacht registered in the name of JTM, an offshore entity controlled by Haryman, and whose only asset is the Yacht.

On January 7, 2002, Martino pled guilty in Florida federal district court to six counts of tax evasion and related charges, certain of which concerned Martino's failure to report certain of the illegal brokerage commissions discussed in Section II. above. Ex. 84. During a March 19, 2002 initial sentencing hearing, the Florida Court sought to determine whether Martino had sufficient assets to repay her debt to the IRS. At the hearing, the Justice Department asked that Martino identify the present whereabouts of the $1.1 million that had been in the Martino Luxembourg Account. Martino's attorney responded only that those funds were "long gone." Ex. 85. On April 9, 2002, the Court in Florida sentenced Martino to 28 months incarceration, which she immediately began serving.

Sometime between March 19 and April 9, 2002, the Commission learned of Martino's Yacht purchase. The Commission learned that Martino's husband, defendant Haryman, was attempting to sell the Yacht through a Florida-based Yacht brokerage. On April 26, the Commission applied for an emergency stay against the sale of the Yacht to preserve it in an asset freeze pending a judgment herein against Martino and CMA, and also requested leave to amend the Commission's complaint to add JTM and Haryman as supplemental defendants (solely for such judgment purposes).

On April 29 the Court granted a temporary emergency stay against disposition of the Yacht or its proceeds and set a hearing for May 21, 2002 thereon and ordered expedited discovery regarding the Yacht.

On May 14, 2002, the Commission took Haryman's deposition. Haryman testified that (1) Martino was Haryman's financée at the time of the November 1997 Yacht

---

20. Martino also made substantive, hand-written changes to the Yacht seller's Warranty agreement, which she also signed. Ex. 80.

purchase; (2) Martino personally paid at least $1.28 million of the $2 million Yacht purchase price; (3) Martino "gave" Haryman the Yacht as a "gift"; (4) Martino and Haryman signed the Yacht purchase agreement; (5) Haryman registered the Yacht in the name of JTM which conducts no business; (6) Haryman, the sole owner of JTM, incorporated JTM solely to shelter that Yacht from Martino's potential liabilities. Ex. 83 (pp. 39–47, 57–109).

The Commission also attempted to take the deposition of Martino (who by then was incarcerated at a Federal Detention Center in Miami). On May 15, 2002, and by Order of this Court, the Commission Staff appeared at the Detention Center to conduct the deposition. Martino refused to attend the deposition. Counsel for Martino had informed the Commission that Martino intended to assert her Fifth Amendment privilege at the deposition. Exs. 88, 89.

The Court found, *inter alia*, that Martino purchased the Yacht in 1997 and that she paid at least $1.28 million of the Yacht proceeds from her own funds, which Martino obtained through her activities selling stock pursuant to Regulation S.

From the time Martino purchased the Yacht until her April 2002 incarceration, the Yacht was located primarily within United States territorial waters. In March 2002, the Yacht was transferred from Florida to the Bahamas, where it is currently moored. Ex. 83 (pp. 122–28); Haryman testified that he could not afford the costs involved to bring the Yacht back and that the cost of keeping the boat in the United States is very high. Ex. 83 (p. 183).

On May 24, 2002 the Court granted a preliminary injunction pending final adjudication of the case against defendants Martino and CMA, among other things ordering that the Yacht defendants shall hold and retain the Yacht within their control and within the territorial waters of the United States; that the Yacht defendants shall prevent any transfer, incumbrance, assignment or other disposal of the Yacht; and that the Yacht defendants shall refrain from taking any other action that would diminish the Yacht's value; and that the Yacht defendants and their Agents shall take any necessary action to maintain the value of the Yacht and to maintain the status quo regarding the availability of the Yacht for satisfaction of any monetary judgment that the Court issues against Martino or CMA.

Haryman and JTM appealed the freeze Order contending *inter alia* that the Court lacked jurisdiction in the premises. This Court's Order was unanimously affirmed (*Securities & Exchange Comm'n v. Martino*, Summary Order No. 02–6115(L), 02–6149(Con), 2d Cir. Mar. 13, 2003). Among other things, the Court of Appeals sustained this Court's findings that there was personal jurisdiction over Haryman and JTM and that JTM was an *alter ego* entity of Haryman.

## CONCLUSIONS

### I. Summary Judgment Standard, Preclusion, and Fifth Amendment Inference

#### A. Summary Judgment Standard

Courts grant summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed R. Civ. P. 56(c). "The moving party bears the initial burden of 'informing the district court of the basis for its motion' and identifying the matter that 'it believes demonstrate[s] the absence of a genuine issue of material fact.'" *SEC v. Zubkis*, No. 97

CIV 8086 JGK, 2000 WL 218393, at *1 (S.D.N.Y. Feb. 23, 2000) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party satisfies its burden, the nonmoving party must "come forward with 'specific facts showing that there is a genuine issue for trial.'" *Id.* at *2 (quoting Fed R. Civ. P. 56(e)). The presence of a genuine issue of material fact, or a " 'fact[ ] that might affect the outcome of the [underlying] suit under the governing law,'" will prevent a court from granting summary judgment. *Id.,* at *1 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). Thus, if "the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party," courts have not granted summary judgment. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Furthermore, courts draw all reasonable inferences against the moving party. *Zubkis,* 2000 WL 218393, at *2 (citations omitted).

### B. *Martino's Failure to Give Testimony*

The Commission asks the Court to preclude Martino from testifying on summary judgment. On August 17, 2001, the Commission took Martino's (and CMA's) deposition.[21] Martino asserted her Fifth Amendment privilege on her and CMA's behalf, and she refused to answer any substantive deposition questions. The Commission was thereby prejudiced in its subsequent discovery efforts. On August 31, 2001, the Commission filed a motion to preclude Martino and CMA from testifying, raising affirmative defenses, or otherwise introducing evidence at trial or on summary judgment.

On October 26, 2001, the Court held the Commission's preclusion motion temporarily "in abeyance . . . until further order of the court." *SEC v. Montle,* 98 CV 3446, 2001 WL 1313648 (S.D.N.Y. October 26, 2001) (Docket # 68). The Commission has renewed this motion. Martino's invocation of her Fifth Amendment privilege rendered impossible a full exploration of Martino's position regarding any defense.

### C. *The Court Draws a Negative Inference from Martino's Assertion of Her Fifth Amendment Privilege*

A party in a civil proceeding has a constitutionally-protected right to assert her privilege against self-incrimination. However, litigants denied discovery based upon an assertion of the privilege may ask the court or trier of fact to draw a negative inference from the invocation of that right. *Baxter v. Palmigiano,* 425 U.S. 308, 318–20, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976); *LiButti v. United States,* 107 F.3d 110, 121 (2d Cir.1997). Martino asserted her Fifth Amendment privilege at her deposition in this case in response to all substantive questions regarding all of the Commission's securities law claims against her and CMA. The Commission has appropriately requested that the Court draw a negative inference from Martino's invocation of that privilege regarding each of the Commission's claims against Martino, CMA, Hary-

---

**21.** The Commission filed this suit against Martino, CMA and other defendants in 1998. Due to Martino's seemingly related criminal investigation, this Court indicated that if the criminal proceeding was a parallel proceeding and based on the same charges, it would defer the civil claims. No stay was in fact entered. Ultimately when the government determined to proceed only for tax evasion, the Court instructed the Commission to proceed with its case against Martino and CMA, and the Commission began to take discovery regarding those claims (including Martino's deposition). The events of September 11, which destroyed the Commission's former New York offices, delayed the Commission's discovery and summary judgment efforts.

man, and JTM. The Court does draw a negative inference from Martino's assertion of her Fifth Amendment privilege.

## II. *Martino and CMA Engaged in Illegal Brokerage Activities*

### A. *Martino and CMA Violated Section 15(a) of the Exchange Act*

Martino, both directly and through CMA, brokered Regulation S stock sales without registering as a broker with the Commission. Thus, both Martino and CMA violated Section 15(a) of the Exchange Act.

■ Section 15(a) makes it unlawful for any "broker or dealer" to make use of any means of interstate commerce and "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" without registering as a broker with the Commission. 15 U.S.C. § 78o(a)(1). The Exchange Act broadly defines "broker" as one who "engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). In determining whether a particular individual or entity falls within this definition, courts consider whether the individual may be "characterized by 'a certain regularity of participation in securities transactions at key points in the chain of distribution.'" *SEC v. Hansen*, No. 83 Civ. 3692, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984) (quoting *Massachusetts Fin. Services, Inc. v. Securities Investor Protection Corp.*, 411 F.Supp. 411, 415 (D.Mass.) *aff'd*, 545 F.2d 754 (1st Cir.1976)); *see also SEC v. Margolin*, No. 92 Civ. 6307(PKL), 1992 WL 279735, at *5 (S.D.N.Y. Sept. 30, 1992)("brokerage" conduct may include receiving transaction-based income, advertising for clients, and possessing client funds and securities). Courts also have considered whether the individual:

1) is an employee of the issuer; 2) received commissions as opposed to a sala-ry; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors.

*Hansen*, 1984 WL 2413, at *10 (citations omitted). The Commission need not prove the broker's scienter to establish a violation of Section 15(a). *See SEC v. National Executive Planners, Ltd.*, 503 F.Supp. 1066, 1073 (M.D.N.C.1980).

■ During the time period at issue (April 1992 through 1995), neither Martino nor CMA were registered as brokers with the Commission. Ex. 90. Nonetheless, and in violation of Section 15(a), both plainly acted as brokers. Martino was the sole owner of CMA, and solely controlled its activities. Thus, her and CMA's activities are one and the same for the purpose of this analysis. Martino and CMA regularly solicited overseas clients to purchase Regulation S stock from U.S. companies, and regularly acted as middlemen between the U.S. sellers and foreign purchasers to complete these transactions. Indeed, their activities satisfy each of the "broker" criteria described above.

From April 1992 through 1995, CMA and Martino regularly participated in securities transactions and did so "at key points in the chain of distribution." *Hansen*, 1984 WL 2413, at *10. In fact, Martino was involved in every aspect of the numerous securities transactions at issue. Ilan Arbel (one of Martino's major foreign clients) testified that Martino was "all the time aware" of the status of his many Regulation S stock transactions, and that she continuously contacted Arbel to discuss his payment for the stock and his satisfaction with the transactions, as well as his receipt of purchase agreements. Ex. 7 (pp. 203–10, 214–18).

CMA and Martino plainly were not employees of Martino's clients. Their written agreements with their U.S. clients describe "consulting" services that plainly are brokerage services. The agreements with Chippewa, VTS, Computer Concepts, and Titanic all allow CMA to serve as a "consultant" and "to perform such duties as are normally associated with the sale of securities." Ex. 5; Ex. 12; Ex. 30. Martino's U.S. clients expressly considered her a "broker," not an employee. In correspondence to a third party, Montle (who represented several of Martino's U.S. clients) referred to Martino as "the broker on this transaction." Ex. 39; Ex. 41. Likewise, Josef Hettrich (one of Martino's major foreign clients) stated in an affidavit that he relied on Martino as his "broker" in connection with certain Lone Star transactions. Ex. 39; Ex. 41; Ex. 42.

Martino and CMA received commissions (not a salary) for their services, and the five CMA agreements identified above plainly reference those commissions. Ex. 5; Ex. 12; Ex. 30; Ex. 35; Ex. 43. In accordance with those agreements, CMA received a percentage of the proceeds of each sale that Martino brokered (in the form of either cash or stock). Moreover, Martino consistently and continuously referred to her compensation as "commissions." See, e.g., Ex. 20; Ex. 23.

CMA and Martino's transactions also were not isolated incidents. To the contrary, defendants participated in the sale of stock of numerous issuers over a period of several years. Martino entered into five agreements with U.S. companies and subsequently made concerted efforts to raise more than $20 million in four years for those companies.

Martino and CMA also assisted in negotiating the stock sales at issue. Under

their written agreements, CMA agreed to act as the "liaison between the buyer and seller" and to "advise[ ] and assist[ ] . . . in negotiations with the prospective buyers as to the terms and conditions of the sale of [the stock]." See, e.g., Ex. 43. And Martino performed such services in each case. For example, Chippewa CEO Larson stated that Martino acted in accordance with her Chippewa brokerage agreement. Ex. 13 (pp. 17–20). Arbel stated that Martino advised him about Regulation S and encouraged Arbel to invest. Ex. 7 (pp. 203–07). And Josef Hettrich stated that he relied upon Martino as his "advisor" in connection with certain Lone Star transactions. Ex. 42.

Martino actively sought investors. Martino agreed in each case to "solicit" purchases of Regulation S stock and actively did so. For example, Martino attempted to "pre-sell" Chippewa stock to investors, and she disseminated Chippewa press releases and Commission filings to attract potential purchasers of Chippewa stock.[22] Ex. 14; Ex. 15; Ex. 16; Ex. 17. In correspondence to Titanic, Martino stated that her "selling efforts will be continuous." Ex. 44. In addition, Arbel stated that Martino "tried to put both sides together," and that Martino repeatedly contacted him to encourage him to purchase stock. Ex. 7 (pp. 203–10, 214–18).

Thus, Martino and CMA plainly acted as unregistered brokers in violation of 15 U.S.C. § 78o(a).

### B. Martino Violated the Bar Order and Section 15(b)(6)(B)(i) of the Exchange Act

█ The Commission likewise charges Martino with repeatedly and flagrantly violating her Bar Order and Section

---

22. The Titanic/CMA agreement also specifically allowed CMA to "offer to sell or solicit orders to purchase" stock. Ex. 43.

15(b)(6)(B)(i) of the Exchange Act. The Bar Order prohibits Martino from "association with any broker, dealer, investment adviser, investment company, or municipal securities dealer." Ex. 2. Section 15(b)(6)(B)(i) of the Exchange Act states makes it unlawful for "any person as to whom an order [such as the Bar Order] is in effect, without the consent of the Commission, willfully to become, or to be, associated with a broker or dealer in contravention of such order." 15 U.S.C. § 78o(b)(6)(B)(i). The Exchange Act defines "person associated with a broker or dealer" as follows:

> any partner, officer or branch manager of such broker or dealer (or any person occupying a similar status or performing similar functions), any person directly or indirectly controlling, controlled by, or under common control with such broker or dealer, or any employee of such broker or dealer.

15 U.S.C. § 78c(a)(18). The term "willful" in the federal securities laws signifies merely that the defendant intended to commit the act which constitutes the violation. *Arthur Lipper Corp. v. SEC*, 547 F.2d 171, 180 (2d Cir.1976) (citing *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir.1965)).

Martino plainly was associated with CMA. During all times relevant to this lawsuit, Martino owned 100% of CMA, was its president, and routinely entered into brokerage agreements with issuers through CMA. Ex. 4; Ex. 5; Ex. 12; Ex. 30; Ex. 35; Ex. 43. Martino also apparently considered CMA her alter ego. In correspondence with her U.S. clients, Martino referred to "my commissions" in accordance with "my consulting agreement," although technically CMA was party to those consulting agreements. Ex. 23; Ex. 33; Ex. 44.

Martino also willfully violated the Bar Order. She entered into each of the agreements on behalf of CMA; she solic-ited the investors on behalf of CMA; she performed brokerage services through CMA; and she corresponded with the U.S. companies in order to facilitate her "commission" payments.

She conducted such activities in substantial part in the United States and from the United States in part using the facilities of interstate commerce. In addition, Martino was clearly aware of her "regulatory history," as evinced by her correspondence with Allan Carlin of Titanic. Ex. 91.

### C. *Martino's Alleged "Advice of Counsel" Defense is Without Merit*

■ Martino has asserted "advice of counsel" as a defense to the Commission's charges concerning her illegal brokerage activities. That defense is without merit as a matter of law and was violated as a matter of fact.

■ To invoke the "advice of counsel" defense, the defendant must show that she (1) made complete disclosure to counsel; (2) sought advice as to the legality of her conduct; (3) received advice that her conduct was legal; and (4) relied on that advice in good faith. *Markowski v. SEC*, 34 F.3d 99, 105 (2d Cir.1994). And critically for this case, the advice received must be timely in that the defendant must receive it *prior* to the illegal conduct. *SEC v. Federated Alliance Group, Inc.*, No. 93–CV–0895E(F), 1996 WL 484036, at *3 (W.D.N.Y. August 21, 1996) (failure to seek timely legal advice "vitiates any notion that the defendants relied on legal advice given prior to their conduct").

Martino apparently predicates her "advice of counsel" defense upon three letters authored by three attorneys representing three parties other than Martino. Ex. 92; Ex. 93; Ex. 94. These letters are insufficient as a matter of law to constitute advice of counsel. First, and perhaps most

significantly, the three letters cannot constitute "timely" advice. They each are dated after January 27, 1994, long after Martino began to violate the Bar Order and the related federal securities laws at issue. Martino's violations had begun in April 1992 (when she began brokering Chippewa and Teleconcepts Regulation S sales).

The innumerable transactions conducted by Martino implicated the prescriptive jurisdiction of the federal securities laws. At the heart of Martino's transactions seeking the protection of Regulation S, which was issued by the SEC and became effective on May 2, 1990, were a course of business of sales of securities made within the United States that must be registered under sections 5 and 12 of the Securities Act of 1933. Her "directed selling efforts" (cf. 17 C.F.R. § 230.903) were largely made in the United States. Her marketing efforts such as mailings, direct communications in the United States designed to induce the purchase of securities purportedly being distributed abroad were made largely to persons in the United States. *See* SEC Release No. 33–6863, 55 Fed.Reg. at 18,-311. Any offer or sale entitled to the exemption of Regulation S to fit the definition of an "offshore transaction" requires *inter alia* that no offer be made to a person in the United States. As explained by the SEC,

> offers and sales [even to] transients in the United States are transactions in the United States and may not be part of an offering relying on the safe harbor of *Regulation S.*

*Ibid,* n. 115.

Martino's conduct included offers of unregistered securities in the United States, in effect, creating and encouraging a market for those securities in the United States. Section 5 prohibits any person from offering or selling a security in interstate commerce unless it is registered.

The terms "offer" and "sell" are construed broadly, *see Pinter v. Dahl,* 486 U.S. 622, 644–47, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988), to reach agents for sellers. The rule, as tersely explained in *Europe and Overseas Commodity Traders, S.A. v. Banque Paribas London,* 147 F.3d 118, 124 (2d Cir.1998), is:

> [S]ales of securities made outside the United States are not subject to the registration requirement of § 5, while those within the United States must be registered.

As stated by the case cited, in footnote 5:

> The SEC statement explains: Rule 901(a) is a general statement of the applicability of the registration provisions of the Securities Act.... For a transaction to qualify under the General Statement, both the sale and the offer pursuant to which it was made must be outside the United States.

### III. *Martino Participated in the Manipulation of Titanic's Stock Price*

The Commission lastly charges Martino with participation, along with defendant Montle and Lowe, in a scheme to manipulate the price of Titanic stock from May through July 1993, in violation of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5 thereunder, 17 C.F.R. § 240.10b–5.

Stock market manipulation is any "intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). "[S]ufficient proof of manipulation [exists] if the manipulator caused either actual or apparent activity or caused a rise in the market price." *SEC v. Resch–Cassin & Co.,* 362 F.Supp. 964, 976 (S.D.N.Y.1973). Courts have considered a

wide variety of factors in determining whether a defendant has manipulated a stock in violation of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, including (1) price leadership by the manipulator; (2) the exercise of "dominion and control of the market for the security"; (3) the manipulator's attempt to reduce the "floating supply of the security"; and (4) collapse of the market for the security after the manipulator's activities cease. *Id.* at 975–976; *see also SEC v. National Bankers Life Insurance Co.,* 334 F.Supp. 444, 446 (N.D.Tex.1971), *aff'd,* 477 F.2d 920 (5th Cir.1973). In addition, the "promulgation of false and misleading [stock] quotations . . . violate[s] the antifraud provisions." *SEC v. Management Dynamics, Inc.,* 515 F.2d 801, 810 (2d Cir.1975).

█ Although a wide variety of manipulative activity can constitute market manipulation, the existence of a single device is sufficient to establish a § 10(b) violation. *See SEC v. Kimmes,* 799 F.Supp. 852, 858 (N.D.Ill.1992), *aff'd sub nom, SEC v. Quinn,* 997 F.2d 287 (7th Cir.1993). Furthermore, an attempted manipulation is as actionable as a successful one. *See Kuehnert v. Texstar Corp.,* 412 F.2d 700, 704 (5th Cir.1969) (section 10(b) is broad enough to encompass any manipulative or deceptive device, regardless of its outcome). Finally, to prevail, the SEC need not identify a specific victim who acted upon the manipulation. *United States v. Haddy,* 134 F.3d 542, 549–50 (3rd Cir.), *cert. denied,* 525 U.S. 827, 119 S.Ct. 75, 142 L.Ed.2d 59 (1998).

█ The Martino/Montle/Lowe scheme employed all of the manipulative devices described above. The scheme entailed Martino's and the other individuals' gaining control of both the supply and demand of Titanic stock sufficient to drive up Titanic's stock price artificially from $5 to $11.75 from May to July 1993. Martino stood to benefit from such a price rise both directly (through sale of her own Titanic stock) and indirectly (by making the stock more attractive to her foreign brokerage clients, who purchased the stock at a deep discount to U.S. market prices and then resold it at market prices). Martino's own principal participation in the scheme included (1) agreeing with Montle and Paul Culotta to control and order their sales of Titanic stock into the marketplace; (2) facilitating market maker Lowe's ability to take large positions in Titanic stock (and post ever-increasing stock purchase quotations) by guaranteeing Lowe against loss (*i.e.,* by guaranteeing Lowe purchasers for his Titanic stock); and (3) paying brokers to influence their clients to purchase Titanic stock (thus increasing demand).

Martino became involved in the manipulation scheme through her Regulation S stock brokerage activities. Martino and Montle agreed to work together to raise capital for Titanic by selling Titanic stock to overseas customers, purportedly pursuant to Regulation S. Their remuneration depended both on the amount and price of Titanic stock that they could sell. Martino and Montle thus were motivated to sell as many presumed Regulation S shares as possible and to make as much in commissions as possible. Critically, Titanic also entrusted to Montle the task of finding a broker-dealer to act as a market maker for Titanic's stock in the United States. *Id.* Thus, Montle and Martino had the opportunity to persuade the market maker (Lowe) to assist them in inflating artificially Titanic's stock price, which in turn benefitted the overseas investors who were sold the Titanic's presumably Regulation S stock from Martino at discounted prices.

In June 1993, Montle and Martino continued to attempt to control the supply of Titanic stock, expressly to protect the

price of Titanic stock during Martino's presumed Regulation S sales. By memorandum dated June 16, 1993, Montle, Culotta, and Martino memorialized their agreement to control the flow of Titanic stock trading, to maintain Titanic's stock price. Ex. 60; *see National Bankers Life Insurance Co.*, 334 F.Supp. at 446 (defendant's limiting supply of stock through selective purchases "calculated to decrease the 'floating' supply with the market maker," and which resulted in a corresponding rise in the value of the stocks, constituted market manipulation).

Martino also employed the manipulative device of protecting market maker Lowe against any downside risk of his purchasing Titanic stock, thus affording him the freedom to purchase large blocks of Titanic stock at ever-increasing prices. This device became particularly crucial in June, when Lowe was no longer the sole market maker and needed to purchase and hold large amounts of Titanic stock to maintain its price. In reliance upon Martino's assurances to find Lowe purchasers of Titanic stock, Lowe took far larger positions in Titanic stock than his firm normally permitted him to take. To protect Lowe, Martino found buyers among her overseas clients and purchased the stock herself. Martino purchased more 52,500 shares of Titanic stock from Lowe during the period June 8 through July 14. In addition, Martino's German customers purchased more than 71,610 shares from Lowe and 16,350 shares from Martino during the period June 16 through July 20.

Martino also artificially increased demand for Titanic stock (and helped Lowe sell) by paying brokers to push the stock to their clients. Martino paid brokers Mario Iacoviello and Andrew Zimmer to purchase Titanic stock for their clients. Andrew Zimmer received at least $34,000 from Martino, while Mario Iacoviello received at least $47,000 from Martino.

Martino's memorandum to Culotta clearly references payments to Iacoviello for brokering Titanic stock.

Martino, in concert with Lowe and Montle, employed several classic manipulative devises with the successful intention of raising Titanic's stock price. The Court holds that Martino violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, as well as Rule 10b–5 thereunder.

### IV. *The Commission Is Entitled to Summary Judgment Against Haryman, JTM, Martino, and CMA Regarding the Yacht*

The Commission is entitled to summary judgment against relief defendants Haryman and JTM (and Martino and CMA) on its claim for turnover of the Yacht, to satisfy the Commission's monetary judgment against Martino and/or CMA.

■ Because the Court has subject matter jurisdiction over the Commission's claims against Martino and CMA, "it has the authority to grant the full panoply of equitable remedies so that the [Commission] can obtain complete relief." *SEC v. Antar*, 831 F.Supp. 380, 398 (D.N.J.1993) (citing *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir.1984), *cert. denied*, 471 U.S. 1053, 105 S.Ct. 2112, 85 L.Ed.2d 477 (1985) and others); *see also, Commodity Futures Trading Commission v. Kimberlynn Creek Ranch Inc.*, 276 F.3d 187 (4th Cir. 2002). The disgorgement of unjustly retained wealth is a "long-standing remed[y] that [is] within a court's equity powers." *Id.* (citations omitted). Thus, the equitable powers inherent in Federal courts certainly extends to a person who, although not accused of wrongdoing, received ill-gotten funds and "does not have a legitimate claim to those funds." *Kimberlynn Creek*, 276 F.3d at 191–192 (quoting *SEC v. Cavanagh*, 155 F.3d 129, 136 (2d Cir.

1998)). Neither Harryman nor JTM has a legitimate claim to Martino's ill-gotten funds paid towards the purchase of the Yacht, and the Court orders that the Yacht be sold and the proceeds of such sale to be used to satisfy the disgorgement award in this matter.

As the Commission has demonstrated, Martino purchased the Yacht in November 1997 in an attempt to hide her assets from creditors. Martino personally paid at least $1.28 million of the purchase price from her own funds. Martino has had unfettered access to the Yacht since the date of purchase. No legitimate claim to the Yacht exists upon which Haryman or JTM might rely. Moreover, any claim by Haryman that the money used to purchase the Yacht was a "gift" is not recognized as a "legitimate claim." *Cavanagh*, 155 F.3d at 136 (stating that relief defendant lacks legitimate claim where proceeds of wrongdoing were a "gift"). Thus, the Commission is entitled to summary judgment against relief defendants Haryman and JTM (and Martino and CMA) on its claim for turnover of the Yacht.

## V. *Martino's Violations Warrant Equitable Relief*

■ The Commission is entitled to the equitable relief it seeks against Martino for her illegal brokerage activities and her participation in the Titanic stock manipulation scheme. But the futility of expecting any positive relief therefrom in monetary terms is all too apparent.

Martino, through CMA, illegally brokered over $20 million in Regulation S stock transactions during a three year period. In return for her efforts, Martino, through CMA, received total payments of at least $4.416 million. Ex. 86.[23] Martino repeatedly engaged in her brokerage activities despite the fact that she was unregistered and had been barred from doing so in April of 1992. Martino's repeated and flagrant violations of securities laws and Bar Order for more than three years more than amply demonstrate the Commission's entitlement to disgorgement, and the Court orders Martino and CMA to pay the Commission $4.416 million in disgorgement.

### A. *Prejudgment Interest*

■ In addition, the Commission seeks and is entitled to prejudgment interest on the full amount of disgorgement. The Second Circuit has set forth the standard for awarding and calculating pre-judgment interest for disgorgement in a Commission enforcement action:

In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance. When the SEC itself orders disgorgement, which

---

**23.** Exhibit 86 is the Declaration of Commission accountant Roseanne Dipippo ("Dipippo") and attached summary evidence chart showing Martino's illegal brokerage revenues known to the Commission. The chart summarizes payments to Martino and CMA, either specifically identified as "commissions" (totaling $2.686 million) or not specifically identified (totaling $1.73 million). The Dipippo declaration is further corroborated by independent correspondence and other records kept by Martino and several of her U.S. brokerage clients (Titanic, Chippewa, Lone Star, VTS, and Computer Concepts), which state that Martino received brokerage commissions of at least $3.771 million, plus 65,000 shares of Lone Star stock valued at $333,125, for a total of $4.104 million.

as discussed above is designed to strip a wrongdoer of its unlawful gains, the interest rate it imposes is generally the IRS underpayment rate .... That rate reflects what it would have cost to borrow the money from the government and therefore reasonably approximates one of the benefits the defendant derived from its fraud.

*First Jersey Securities, Inc.*, 101 F.3d at 1476 (citations and internal quotation marks omitted). The same prejudgment interest formula is awarded in this case and on the disgorgement remedy against Martino and CMA at the IRS underpayment rate.

## B. *Permanent Injunction*

 The Commission is entitled to a permanent injunction against Martino and CMA, prohibiting her from future violations of the federal securities laws.

A District Judge is vested with a wide discretion when an injunction is sought to prevent future violations of the securities laws, ... and "cessation of illegal activity does not ipso facto justify the denial of an injunction." ... The factors which [a district Court] may consider include the likelihood of future violations, the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir.1976) (citations omitted), *cert. denied sub nom., Homans v. SEC*, 434 U.S. 834, 98 S.Ct. 120, 54 L.Ed.2d 95 (1977); *see also, Management Dynamics, Inc.*, 515 F.2d at 807 ("Certainly, the commission of past illegal conduct is highly suggestive of the likelihood of future violations"); *SEC v. Batterman*, No.

00 Civ. 4835(LAP), 2002 WL 31190171, at *9 (S.D.N.Y. Sept. 30, 2002) (noting that defendant's previous conviction and regulatory sanctions suggest that he is likely to engage in similar acts in the future); *SEC v. Sekhri*, No. 98 Civ. 2320(RPP), 2002 WL 31100823, at *15 (S.D.N.Y. July 22, 2002) (finding a greater likelihood of future violations where defendant's illegal conduct was "founded on systematic wrongdoing," not an isolated incident). All of these factors support the imposition of an injunction against Martino's future violation of the federal securities laws and it is so ordered.

Given the opportunity, Martino would likely violate the securities laws in the future. She has an extensive history of violating the securities laws and already has been enjoined from doing so. Moreover, in an apparent display of defiance, Martino agreed to provide brokerage services to VTS on the very day that the Commission issued its Bar Order. In addition, Martino's violations of the federal securities laws were not isolated events. To the contrary, at least from 1989 through 1995, Martino made her living by violating those provisions. During the three-year period at issue in this case, Martino violated both the antifraud provisions and broker registration requirements of the federal securities laws, while brokering millions of dollars worth of Regulation S stock transactions and manipulating the Titanic stock. Moreover, Martino has never acknowledged the wrongfulness of her actions. Martino and CMA are enjoined from future violations.

The Court grants the Commission's motion for summary judgment against defendants Martino and CMA and relief defendants Haryman and JTM, orders Martino and CMA to disgorge their illegal brokerage revenues (plus prejudgment interest) and permanently enjoins Martino and

CMA from future violations of the federal securities laws, and orders Haryman and JTM to turn over the Yacht or its proceeds to a court-appointed receiver as partial payment of the disgorgment figure imposed on Martino and CMA.

So Ordered.

### ORDER

The cross-motion of defendants Martino and CMA Noel, Ltd. and relief defendants Gerard Haryman and JTM Ltd. for summary judgment and an order, pursuant to Fed. R. Civ. P. 39(c), Scheduling the action for trial is denied in all respects.

So Ordered.